Mr. Marshall, would you kindly call the last case of the day on the Court's docket? Yes, Your Honor. This case will be called Hit Pursuit Day, 17-0617. Daniel Hites v. Waubonsee Community College, Defendant Kathleen. Argument on behalf of Defendant John, Mr. Adam, and Mr. Kaufman. Argument on behalf of Defendant Kathleen, Mr. Paulette, and Mr. Trevor. Thank you, Mr. Kaufman. I read the affidavit, Your Honor. You may proceed. May it please the Court. In this case, my client, Daniel Hites, has made seven narrow requests for information from Waubonsee Community College's Banner database under FOIA. The College initially denied these requests and moved to dismiss Mr. Hites' complaint, asserting that the data in its databases were not public records subject to FOIA, and that querying the information Mr. Hites sought would amount to creation of a new record. That's in Hites 1, isn't it? Yes, Your Honor. I think we all got the facts. After that original motion to dismiss was granted, this Court held that the data within Waubonsee's databases is a public record subject to FOIA, and importantly, this Court recognized that databases are crucial to a world of ever-increasing generation of and use for data, and that WCC should not be able to input information from public records into a database and in turn shed its duty to disclose that information under FOIA. Upon remand, however, WCC again sought to shield its databases from FOIA by asserting that even Mr. Hites' narrowly tailored requests are unduly burdensome, and the Circuit Court improperly dismissed Mr. Hites' complaint on this ground. The Circuit Court's dismissal order, which is reviewed de novo by this Court, should be reversed because it is based on palpably erroneous factual findings and because WCC has failed to meet its burden as a matter of law. First, the Circuit Court's dismissal order is based on two clearly erroneous findings that are not entitled to any deference by this Court. The first error pertains to the time required by Mr. Hites' requests. The Circuit Court found that it would take WCC's programmers at least a week to develop a program for each of Mr. Hites' seven requests, and that complying with these requests would require well beyond 150 hours or 20 personnel days. And what do you tell a court to base that decision on? Does that make any do with the testimony of Mr. Felton? It does, Your Honor. Now, does this fall under the issue that it would be unduly burdensome? Yes. Okay. So, Felton's testimony purports to be that it would be unduly burdensome? So, Your Honor, the Circuit Court misunderstood Mr. Felton's testimony. Mr. Felton testified that each of the seven requests would take a Wabansi programmer a week in total to complete, but not that it would take a week's worth of effort to perform, to write the query and to perform the search. Rather, that it would take a week because that work must be fit in among the programmer's other obligations. Not that it would take a week in terms of straight hours. Exactly. What Mr. Felton testified was that each of the seven requests at issue here would take approximately one day's worth of effort if a programmer devoted their time just to that request. Thus, the amount of burden involved in complying with Mr. Hite's requests, the Court's findings regarding the burden imposed by Mr. Hite's requests, was five times the burden that Mr. Felton actually testified. Second, the Court erred in finding that some of the information responsive to Mr. Hite's requests would have to be queried from databases outside the College's control. In the Court's dismissal order in the record at C-1474, the Court concluded that some of Mr. Hite's requests would require information from the Data and Information System of Illinois, or DAISY, database and from the Driver's Safety Program database. Here, the Court again misunderstood Mr. Felton's testimony. Mr. Felton testified at C-828 in the record that each data field, each piece of data sought by each of Mr. Hite's seven queries is contained within the College's Banner database, which is within the College's control. He also testified that certain of the data is also housed within the DAISY and Driver's Safety Program databases, but in order to comply with Mr. Hite's requests, it is not necessary to query databases outside of the College's control. Because of these errors, the Circuit Court's findings as to the burden imposed by Mr. Hite's requests are not entitled to deference. Are you saying that they're a question, it's a question of fact? The question of the undue burden? Well, not entirely, Your Honor. The College, I'm sorry, the Circuit Court made certain factual findings on which it faced its conclusion that Mr. Hite's request would be unduly burdensome. But the determination of whether FOIA requests are subject to the undue burden exception is a question of law this Court has developed. So there's a dual standard then. In terms of the Court's factual findings, do we not review them under the manifest weight of the evidence standard? You're correct, Your Honor. This Court does review factual findings under the manifest weight of the evidence standard. However, under Northern Illinois Service Company, factual findings that are palpably erroneous and unwarranted are not entitled to deference by this Court. And the Circuit Court's findings that each of Mr. Hite's requests would require a week's worth of effort and would amount, total over 150 hours of effort. In fact, if you do the math, a 40-hour work week for seven requests would be over 200 hours of effort, is unsupported by the record. That is not what Mr. Felt's testimony was. It was that each of the requests would take approximately a day's worth of effort, but that that day's worth of effort would have to be spread over approximately a week to fit within the college's employees' other obligations. The Circuit Court's finding that certain of the information sought by Mr. Hite's requests is also only available from the DAISY and driver safety databases, which are outside the college's control, was also incorrect. Mr. Felton will testify that each of the data fields sought by Mr. Hite's requests are contained within the Banner database, which the college has the ability to query and is within the college's control. For that reason, the Circuit Court's conclusion regarding the burden imposed by Mr. Hite's requests is not entitled to deference. And the question turns to whether the college satisfied the standard required by FOIA of establishing its entitlement to the undue burden exception by clear and convincing evidence. Which, this Court has explained, is the quantum of proof that leaves no reasonable doubt in the mind of the fact finder as to the truth of the proposition in question. Moreover, a dismissal on the pleadings, like the Circuit Court's order dismissing Mr. Hite's complaint, is only warranted if clearly apparent that no set of facts can be proved that would entitle the plaintiff to the relief sought. Your Honors, this Court made that conclusion in Woodley-Grace Lake at 229 ILL APP 3rd, 343 at 348. So, training the question of whether the college has met its burden of proof, it has not because the record establishes that there are facts supporting that Mr. Hite's requests are not unduly burdensome. Thus, the college can't establish by clear and convincing evidence that no set of facts can be proved entitling Mr. Hite to the information sought. In particular, plaintiff's expert, Mr. Delatish, whom the Circuit Court accepted as an expert in database analytics, testified that it would take a matter of minutes to write and run the query required by each of the seven requests at issue here. Isn't the judge entitled, though, to weigh that testimony of the experts and to find that Mr. Felton is more credible than the other experts, merely because of his familiarity and so forth with all of the programming and that kind of thing? So, Your Honor, the Circuit Court is certainly entitled to weigh the evidence. Although, here, the Circuit Court misunderstood Mr. Felton's testimony and, therefore, his weighing of the evidence is not entitled to deference. And, in fact, the court never found that Mr. Delatish's testimony was not credible. In addition, aside from Mr. Delatish's testimony regarding the burden imposed, the College's Chief Information Officer, Mr. Felton, also testified that he was not an expert in the type of population selection queries that are what the query's, what the FOIA request issue here would call for. Aside from the Circuit Court's errors regarding the burden imposed, the court also erred in finding that the College had met its burden to confer with Mr. Heitz in an attempt to alleviate the burden imposed by the requests. The College has not extended Mr. Heitz an opportunity to confer and, instead, has sought to take advantage of the nature of Mr. Heitz's requests as calling for database searches to assert a Catch-22 argument that it is impossible to narrow their requests to reduce the burden. Wabatsi only asserts that the, and the Circuit Court concluded, that the College has satisfied its obligation to confer with Mr. Heitz regarding ways to reduce the burden by offering to let him narrow his requests, not that the College actually conferred with Mr. Heitz. Did the Court here, in this case, even make any findings about whether Clintus' requests could be narrowed? Any specific findings on that issue? No, Your Honor. The Court concluded that the College satisfied its obligation to extend an offer to confer with Mr. Heitz and, therefore, it satisfied its obligation. And that was in the dismissal order C-1473. The College's position has been that the requests at issue here, the burden imposed by the requests at issue here, is the work involved in writing and creating the queries that would pull the data requested by Mr. Heitz. Therefore, they've also taken the position that in order to narrow those requests, it would make the queries more complicated, would add more limiting factors to those queries, which would complicate the query and, in fact, increase the burden even though the scope was narrowed. They've also taken the position that a less specific query, a broader query, improperly expands the scope of Mr. Heitz' requests and, therefore, isn't permitted under the statute. Your Honor, we would submit that that is an unsupported position under the statute. The FOIA statute at Section 3G says, Before invoking the undue burden exception, the public body shall extend to the person making the request an opportunity to confer with it in an attempt to reduce the request to manageable proportions. Thus, the statute requires that the parties, that the public body, extend an opportunity to confer regarding ways to reduce the burden, not to reduce the scope of the FOIA requests. Here, Mr. Heitz has attempted to propose ways to lessen the burden of his requests. The college has not, has never entertained his, has rejected his attempts to narrow his requests and has never offered to confer with him. In particular, the community college only, has only offered to allow Mr. Heitz to narrow his requests. And has said that, in response to the initial rejection of his requests, Mr. Heitz asked if it would alleviate the burden to produce the entire database at issue and also asked if there was information that could be provided on ways, on how the database could be queried so that he could come up with a less burdensome query. The college rejected these requests by Mr. Heitz, which his request is found at C-171 in the record. The college rejected these immediately out of hand as not, as asserting that his requests are not capable of being narrowed to manageable proportions. And since then, has never offered an opportunity to confer with him. All right, thank you very much. We'll have an opportunity to address the court in the rebuttal. Ms. Petretti, you may proceed on behalf of the appellate. Thank you, your honors. I'm here to raise the court of Paulette Petretti on behalf of New Brunswick Community College. Your honors, I think I'll start by responding to some of the arguments that were raised by Heitz's counsel. First of all, the issue of whether the time element. The record is very clear. During direct examination, Terrence Felton, the chief information officer, testified about how the college would have to go about developing a query to satisfy each of these requests. And he testified that it would approximately take at least a week to develop the program for just one question. Didn't he later on cross-examination, though, say that that would be taken into consideration that they're still working on their normal tasks, and that actually the hours here, specific hours, for each request would be about, he said something like, let's say eight hours. I would give them a day or something. And he said he would give them a day for each one of those requests. Yes, your honor. On cross-examination, he did. He said something like if the programmers were directed to devote themselves entirely to Heitz FOIA project, it might be possible to take a day to complete each one of the requests, except, he said, for any complexities they may encounter. So by saying that it's going to take them a week for each one of these requests, that's assuming that they're doing their other duties throughout the day and working on this just for a short period of time. Yes, your honor. Just a minute. If they're working on this, let's say a half a day, it would take two days, right? Well, there are seven requests. No, per request. If they're working on this for half a day, they take the whole morning, this morning I'm going to just work on this FOIA request. For half a day, it would take two days, right? Your honor, I think that depends, because if there are complexities involved. You're talking about somebody sitting there and concentrating on this, with everything else going on. We're looking for a list of zip codes. How complex is that? It is complex. As Terrence Felton testified, there are millions of pieces of data on the college's databases. And before you get to the zip codes that he was looking for, you have to go through a series of queries to slice it down to what he wanted. And then you have to run it, you have to test it, you have to find the right query to do it. And you have to test it. You're publishing information that is allegedly record, and so there has to be accuracy involved. Isn't it a little disingenuous to say it's going to take us a week per request? When in reality, what it really depends on is how much time you devote to it each day. If you just take on one of those things, one request, and that's all you focus on, for a day or two, it's not going to be 150 hours cumulatively. Wouldn't you agree with that? Your Honor, I can't agree because of the facts that underlie this. There are only two programmers that are qualified to do these queries. They do numerous other things. As the testimony has said, they have 40 or 50 other tasks. Well, let me ask you this. Is it the position of Waubonsie Community College that FOIA requests are a lower priority than normal day-to-day duties of Waubonsie Community College? Are they a lower priority? No, they're not a lower priority. Then why wouldn't they be? Are they top priority? Your Honor, I think the position is that there is a 3G exemption under the Act, and that this was an appropriate situation in which to invoke that exemption. And so they have that opportunity. The Circuit Court agreed after sitting through three days of testimony and listening to our witnesses testifying under oath. If Waubonsie had taken the position that, you know what, these FOIA requests are really important, we're going to give them top priority. If that was the case, wouldn't they devote their people to it full-time, get it out, and be done with it? Your Honor, they couldn't possibly. These programmers are responsible for the databases. The College is a multimillion-dollar institution with 25,000 students each year, 1,500 employees, budgets, taxpayers that are, you know, they have to be responsible to. They could not possibly take these people away from their jobs to look for the kind of information that Mr. Heitz is seeking. And I think that has to come into play when the Court looks at this. He is asking for the extraction of zip codes, thousands of zip codes. What is that going to look like when we give him listings of just thousands of zip codes? What meaningful data is that that is going to enlighten the public on how Waubonsie connects to this? Is it Waubonsie's job to determine whether it's meaningful data? No, Your Honor, that was the Circuit Court's job, and he did look at that. He did look at that. It was our job to convey what this was going to be, what it was going to look like. Well, it sounds like from your statement that you just made, though, that Waubonsie's making a judgment call that how could this list of thousands of zip codes be meaningful? That's not Waubonsie's job, is it? No, it is not, Your Honor. It is not. And Waubonsie did not look at that. Waubonsie looked at how are we going to complete this? How are we going to compile this data? And the analysis was very clear. Terrence Felton went to his programmers and asked them, look at this list. What are we going to do? How are we going to come up with it? And it was after consulting with these people who had been at Waubonsie for 15 years each, they said we're going to have to decide which databases we're going to go in. Some of that information, contrary to what counsel has said, is not available. The zip codes for the defensive drivers, that goes through the court system. The court system sends data to the college so that these drivers who have traffic citations take classes. That is completely outside the Banner system. But the correct answer to the question, we've been parsing words and going back, it would take eight hours, it wouldn't take a week. Correct? If they were allowed to look straight on it, it would take. To me, I'm listening, it's like somebody says, how long is it going to take you to drive somewhere? And the answer is eight hours. And then we find out eight hours if you take three hour breaks. So it was, the answer I direct was misleading, quite frankly. But, Your Honor, I do think it would be misleading to say we're going to be able to get this done in two days. I think that would be misleading too. When somebody asks you how much work it would take, you don't, a week. You know, it's like saying, we can do this in eight hours as long as we're not distracted. But that isn't really the import of the question. How much labor does it take to do it? Not a week. I mean, I think this characterization is accurate. It's a little misleading to say a week and leave it hanging in the air. I would think they'd be sitting in front of their computers. If I heard that answer. But, Your Honor, we did at the hearing, the judge heard that he said, Terrence said, if they didn't have anything else to do, if they were completely devoted, they could do it in a day. So Judge Aikman took that into consideration. But did he correctly interpret that evidence or did he do it in a way that implied it was a week? Your Honor, I think what he said is that it would be unduly burdensome. That was his, after sitting there and listening to the testimony, he heard it. It was, you know, in our briefs, this is not, nothing was concealed here. No, right. I think he obviously heard the cross and direct. But then the question becomes ultimately, is this finding against a man if it's a week? The finding would be, should have been eight hours, not a week. So is eight hours unduly burdensome? That's really the question to be answered, right? Eight hours for each question, if that's the way you want to put it. Each question? For each of the requests, yes. But you have to take into consideration what that burden is going to do to the college. That's part of the analysis as well. I mean, these two people are going to be taken away from their other jobs. And that is very relevant in terms of looking at it. And Judge Aikman went through each aspect of 3G. You know, was there a burden, which he found there would be a burden. And he estimated that it would be an undue burden. Did the college give Heights the opportunity to narrow the request? Yes. I mean, that is in the records. We spent months before this case was ever filed going back and forth. They were in writing saying, can you narrow the request? But the requests were not narrowed. They were broadened. They wanted the whole copies of the entire databases. Millions of pieces of information. Which the college said, look, we have security interests here. Not even the president is allowed to get access. Now, did you cite the Shahena case to the trial court? Yes, sir. Yes, Your Honor. How was that controlled? Why is that analogous to the case here? Because in that case, the, Shahena dealt with the undue burden under 3G. And went through the factors. And there are very few cases that construe 3G. This one is really directly on point. And it construed it, it also construed it as compared to an analysis of whether an exemption under Section 7. What the burden is of proof under Section 7. Which there is a clear and convincing standard. Because you are trying to basically withhold records from the public. Based on one of the exemptions. Isn't that case distinguishable? I want to ask you about this as I'm scanning and beholding the case. It appeared to me, at least, in the Shahena, the office is going to have to conduct an open review of over 9,000 documents for general legal guidance by physically reading and redacting all of those documents. The search here would not involve anybody physically reading and redacting the documents, wouldn't it? They're searching electronic search for a database, right? So isn't 9,000 documents going over and reading and redacting physically by hand different than consulting an electronic search record? Well, there was an analogous, when this case started, there was also a request for the paper records. So we were looking at literally more than 9,000 in terms of the student registration records. But the zip codes would not require a manual reading, would they? No, but the zip codes, like I said, some of the zip codes are not on, for instance, the defense of driving, going back to that one. And there was testimony. That is not on the Banner database. It comes in and really in that case, they would have to be redacted. For instance, in 2011, there was testimony, they got 8,000 submissions from the court. And we produced one of the exhibits as one page of that, showing that it would have to be manually redacted to just leave the zip codes. So in that case, there would be some calling of documents. And the other, the DAISY database was relevant to the adult education records. See, he had different categories. The one was defense of driving. He had ESL and GED, which are adult education classes. And that really does get the DAISY database involved, which is a state database, which, once again, the college does not control or manipulate. And then the Banner was the college's database. And that really was the one on which the city codes, the county codes, and the are you a U.S. citizen, that's what they would be looking for on that. But even under the Banner database, the actual forms are not included in total. The fields are different. So that would be another aspect of trying to get the raw data that he's seeking from fields, the registration form. Those are not the same fields that you would find under the database. So that's where it comes into, you have to narrow it down and figure out, where am I going to be able to find the county code? Where am I going to be able to find the are you a U.S. citizen? So it's not as easy as their expert thought it was. You're certainly not going to be able to just put in information and hit a button and get the answer to these questions. It's going to take analysis, expertise on the part of the programmers, and concentration. And that's why I think that the week was brought up originally, because if they spend some time on it, when you go back, you want to check yourself and make sure, have we covered all of the aspects of this? And I think if you do read the testimony, you will see, I mean, there was no attempt whatsoever to try to mislead the court. And the court heard both the direct testimony, the cross-examination, and asked its own questions as well. So in terms of that, I do think it's important that there is, the court recognizes the distinction between the 3G and the Section 7. So unless my time is up, if the court has any questions, be happy to entertain them. Thank you very much. Thank you. Mr. Coughlin, you may address the Court and move up. May it please the Court. First, Your Honor, to address the timing issue and what Mr. Felton's testimony was regarding the burden that was imposed, I think this is clearly addressed in the record at C-837, lines 17 to 22, where Mr. Felton was asked, in other words, it wouldn't take somebody a week to actually sit down and write the program that would pull out the names and zip codes of people who took driver safety classes, right? Answer, no. Mr. Felton then proceeded over the next several pages to explain that each of these requests would in fact take one day if the programmer devoted himself to writing the program. When I asked her about that, she pointed out the obvious. The trial judge heard this. He heard the direct and cross, so presumably he was aware of the clarification, right? Well, Your Honor, the dismissal order doesn't reflect that. He concluded that each of these requests would take a week and that in the aggregate they would require more than 150 hours. He was actually comparing the burden in this case to the National Association of Defense Counsel, the Chicago Police Department case, where the court found that a burden of 154 hours, I believe it was, did not constitute an undue burden. So the court was comparing the actual burden imposed here versus that case and concluded that it was a greater burden. And so I think he was in fact... So you're saying his factual findings belied the fact that he took into consideration the clarification, is how you seem to be suggesting? I believe so. The circuit court misunderstood the import of Mr. Felt's testimony. On the factual questions, a factual question decision is against the manifest weight of the evidence. The standard is only if an opposite conclusion is clearly apparent, right? Well, Your Honor, this Court has concluded that findings, a factual finding is against the manifest weight of the evidence when it is palpably erroneous and unwarranted. Here, the regular case says that. That is on the manifest weight of the evidence. That's a new standard. One second. Palpably erroneous. That is the... I've lost my notes. I'll get that in one second. Under Northern Illinois Service Company, the Illinois EPA, 2016 IL APP 2nd 150172, at paragraph 34, this Court stated, a factual finding is contrary to the manifest weight of the evidence when the fact finder's finding is palpably erroneous and wholly unwarranted. Give me the next slide again, would you please? Yes, it is 2016 IL APP 2nd 150172, at paragraph 34, and that case is cited and quoted on page 6 of our reply brief. Thank you. Your Honor, as to the issue of whether the data responsive to the request is actually housed within the college's Banner database, again, the record is very clear on this. At C828 in the record, Mr. Felton was asked, and you could write a program to extract everything that Mr. Heitz is asking for in his FOIA requests out of the Banner system. Is that right? Mr. Felton answered, well, I need clarification on the registration question. And once you got clarification on the registration question, you could write a program that would, yes. He then clarified that would all come out of the Banner database, yes. As to the registration question, that was addressed at C782 in the record, Mr. Felton's question was whether the data, the requests for registration information related to where the class, where the student was physically when they registered for the class, or where the class was held. Mr. Heitz's requests are seeking information about classes that students took at Wabansi Community College. Regarding the Shahida case, Mr. Brenner, I also agree there were two issues at play in Shahida. First was, well, the requested issue were any documents that would be relied upon by the Attorney General to respond to a FOIA request. The Attorney General concluded there were 9,200 documents that would have to be manually reviewed,  so that is, again, as Your Honor noted, a different burden, a very different analysis than the queries at issue here, which are seeking electronic records out of the database. But the burden here is analogous not to the review of the records, but of the querying that would identify what the responsive records were. Thank you, Your Honor. All right. Thank you very much, Mr. Kaufman. Thank you. I'd like to thank both counsel for the quality of their arguments here this afternoon. The matter will, of course, be taken under advisement in a written decision on this matter issued in due course. We stand adjourned for the day. Thank you.